AgroSciences, Mr. Montana. Good morning, and may it please the court. Bayer sold rights to its soybean events to the Stein Group of companies. Harry Stein asked Bayer to divide the rights, to split up the rights Bayer was willing to sell to the Stein Group between two non-sublicensable commercial rights to Stein Seed for $4.6 million and a research license to MS Tech for $1 million. But Dow won this case by arguing that the MS Tech license in fact included sublicensable commercial rights, the very thing that was banned in the Stein Seed agreement. But you're not re-arguing the merits, you're just telling us what, that there was a substantial basis for the We accept and understand that we lost. It's unfortunately somewhat difficult when you come here in a 285 posture. You do have to sort of relate back the merits and why we thought we could have won. But yes, you're correct. The district court here awarded fees under section 285 for reasons that not even Dow will defend anymore. The district court said at page 810 of its ruling that Bayer's position was contrary to the plain language of the MS Tech agreement. In fact, this was the first reason the district court gave in awarding summary judgment to Dow. But now Dow has finally admitted that Bayer's reading is plausible. Page 53 of its brief, Dow says that which reading is correct depends entirely on context. And Dow has to say that. But maybe what they meant was in the context of looking at both of the license agreements together, i.e. you look at the Stein Seed agreement, you look at the MS Tech agreement, you see how they fit together and you look at all of the different provisions, the first recital all the way down to exhibit 3.1.5. And when you look at all the relevant provisions together in the two license agreements, you arrive in the context of those two agreements at an irrefutable conclusion that MS Tech had an exclusive license to fully exploit these patented technologies, except for the fact that Stein Seed had a non-exclusive right to commercialize. I think that's their argument. So if that's their argument, then you can go ahead and keep talking. And if that were entirely correct and no reasonable person could conclude otherwise, Dow should have won its motion to dismiss because Judge Andrews had all of that in front of him as well. And we prevailed on that motion to dismiss and went forward. But there's other reasons why, including all the language that you just cited, other reasons why our reading of the contract was plausible. As I said, Judge Andrews denied the motion to dismiss. And of course, retired Justice Lord Collins not only said that our reading was plausible, but that ours was the only reading. He acknowledged, though, that he wasn't aware of the factual matrix, right? And then he kind of had to back away in light of being questioned by the judge below that his testimony wasn't really a full, complete one because he wasn't aware of the factual matrix. Well, what he actually said was, as an English jurist and under English law, experts are not permitted to offer final opinions as to issues of law and are just law applied to facts and are just supposed to say what the law is. And I think that's what he was saying. But irrespective, the district court said the plain language allowed only one reading. And retired Justice Lord Collins said, actually, the only reading it allowed was ours. So, irrespective of what facts he was looking at and many of the things, of course... Did Lord Collins consider and testify as to understanding of the first recital, divesting the asset, and then looking at all the other provisions, including the Exhibit 3.1.5? I believe he did as to the recitals because the sixth recital, the carve-out, was pretty important to But, in any event, when you're referring to the plain language, of course, he said the plain language only went one way and the district court said the plain language could only go the opposite way. But there's a second and more fundamental problem with the district court's 285 ruling, and that's its repeated refrain that no witness supported Bayer's view, even going so far as to say that Bayer's witnesses supported Dow's view. And this is clear error. And just a few weeks ago, in this large audience display systems per curiam opinion, a panel of this court remarked that while the octane fitness requires looking at the totality of the circumstances, the circumstances upon which a district court relies must actually exist and findings that such circumstances exist must be justified by the record. And on this no witness point, those circumstances do not exist and are not justified. Margaret Keating, the lawyer who negotiated the deal for Bayer, testified over and over again that she read the contract the way Bayer thought it should be read. First, she said, we wanted to be very sure we were transferring what was appropriate and only as broad as it needed to be. Setting out that the bundle of rights Bayer was giving to the Stein group was only going to be as broad as Bayer needed it and Stein needed it to be for the Stein group to commercialize. I thought she also testified that nobody was thinking about or no one was discussing at that point in time at the time of the license agreements that Bayer had any intention of reserving commercialization rights. Well, at A7454, page 100 of her deposition, she says she did recall a discussion of retaining rights. But that's exactly, that brings up a very interesting point. Retaining commercialization rights. As a practical matter, Bayer was not going to immediately re-enter the soybean business because they'd given, they'd sold all the assets, the physical material to MS Tech and Stein. And in order to go back into this business and the Didn't Morgan and Schulte say Bayer was getting out of the soybean business. That's absolutely correct. And it's utterly consistent. And so now they were looking to liquidate their assets in the soybean technology world. Absolutely, Judge Chen, and that brings to the point. What price you're willing to sell your liquidated assets to depends on your counterparty. Here's the Stein group of companies. So Stein group's willing to pay 4.6 plus 1 million dollars for these assets. If the Stein group was acting as a straw purchaser for BASF or Syngenta or Dow or Pioneer, the price would have been different. It's not retained commercialization rights in the sense that Bayer intends to jump back into the business and all Bayer's witnesses testify to that effect. It's a retained right to be a part of the conversation if Stein is going to fund that flip and turn around like they did and go to Dow and hand over our valuable IP at a price that we never would have accepted from Dow. And we know that because Dow's been ordered to pay 500 million dollars for what it did with respect to enlist in the Bayer 3 arbitration. We have a good idea of what it is Bayer would have demanded if Stein had been acting as a straw for Dow. And that's what Margaret Keating said at 48-44 when she said we were only wanted to transfer what was appropriate and only as broad as it needed to be. But she also said I have no specific memory of them not having the right to sell, didn't she, on the prior page in her testimony? Well, which is really not surprising. She actually said she had no specific memory of conversations about that, but that's really not surprising. The best evidence of what could be done are the agreements themselves. And to turn it around, Judge Stoll, there is absolutely no explanation from Dow and there never has been of why the There can be none other than when the bundle of rights were handed over, the commercial rights that were handed over to the Stein group were non-sub-licensable. But I understood that there is evidence in the record that you didn't care, your client didn't care who was paying what for what part of the rights, that they were able to divide it up amongst themselves as they wished. At least there's testimony to that. That's absolutely correct, Judge Stoll, and it gets to the key non-sequitur of the District Court's opinion. Bayer did not care how the bundle it was handing over was divided up. That doesn't mean Bayer didn't care what the bundle was. The District Court took testimony from Morgan, from Ms. Keating, and from our 30B6 witness saying Bayer didn't care how Stein allocated these rights to mean Bayer didn't care what the rights were. That's a non-sequitur. Bayer cared deeply. Ms. Keating said it at A4844 in testimony the District Court relied on for finding that no witness supported Bayer. In fact, Ms. Keating over and over again said that our interpretation was correct. She said she remembered discussion of retained rights, as I've said, at A7443. She said that the Stein group could only commercialize if they worked together. She said that MS Tech did not get commercial rights at A4845. And yes, she said she had no specific recollections of discussions about this, but this is memorialized in the agreements themselves. And actually, if you take a look at A5789, that's the first draft of these provisions authored by MS Tech's lawyer, Mr. Saluri. And if you look at the provision for MS Tech in there, it's clear as day that the exception is meant as an exception to the power to sub-license. And I'd encourage you to just take a look at that. These were drafted by MS Tech and Stein. These reflect what the parties understood. And what the parties understood is there was a ban on sub-licensing. And again, I know it sounds like I'm re-arguing the merits, but I do so only to point out that Bayer's position wasn't so exceptionally weak that we should be here on a 285 finding. And in that sense, I'd like to... I do agree insofar as the conduct over the ownership issue is implicated. And I'm into my rebuttal time, but I'd like to answer your question. As to the preliminary injunction and the speed with which we moved to amend the complaint, those are inextricably tied up with the merits of the case. You can move quickly if you have a good case, and you can file for a preliminary injunction if you have a good case. As to ownership, it is Dow's, it's actually laid at Dow's door what went on with ownership. At A9941 is Dow's press release announcing enlist. At the bottom of it is a sentence that says unequivocally, a public statement from a public company, Dow owns enlist. If Dow owns enlist, then there's no way MS Tech or Stein could have given any rights to Dow because all MS Soybean events have to be by or for MS Tech. So Dow started this problem by saying they owned enlist. That by itself creates a good faith basis. We're talking about your conduct, though, and what you said to this court in Bayer 2, and then what you said to, in the arbitration in Bayer 3, right around the exact same time. And they look like they're saying this. They are Janus-faced. Well, Janus-faced in the sense that we've lost summary judgment when Dow submitted a declaration at the summary judgment phase for the first time with one of its witnesses testifying, no MS Tech owns enlist. So we lose. And then apparently, I guess what we're supposed to do is agree to lose both cases on irreconcilable factual theories. No. What we did was not litigation misconduct. To do anything else would have been malpractice to go to the Bayer 3 arbitration and agree to lose on a theory we had already lost on in the district court. It doesn't make any sense. And yes, we did appeal the issue to this court. There was plenty of evidence that Dow had some ownership interest. We lost. We did the right thing. We did not litigation misconduct to tell the arbitration panel in paragraph 148 of our submission that it was judicial estoppel. Dow says we didn't use judicial estoppel. It's right there in our reply brief. Thank you, Your Honor. I'll take the rest of my time. Thank you. Thank you, Mr. Montana. Mr. Davies. Good morning, Your Honor. May it please the court. So what we didn't just hear was the word deference. So let's start there. As the Supreme Court recently held, this court's review of a Section 285 fees award is deferential. And it's deferential, the court explained, because the district court lives with the case over a prolonged period of time. But there really is a fundamental issue, is there not, on the question of when attorney's fees are to be awarded in this evolving jurisprudence that we have back and forth between us and the Supreme Court and various cases. And perhaps the standard has been liberalized, but the question is, how far does that go? I think that's well put, Your Honor. The point I would like to make is underlying, but I think this court's and certainly the Supreme Court's jurisprudence is respect for the district court process. And what happened here is we had a district court pour over the record, two-day summary judgment hearing, issue a 32-page fees award, finding that Bayer's theory here rested on contorted theories of a contract and had no witness support. And the district court not only had the fees, not only had that hearing, but had a magistrate opinion, a detailed opinion issued after a fees hearing. So as the district court observed, if ever there were an exceptional case, it is this one, DAS has invested millions of dollars in an innovative product and as we explained, Bayer decided not to compete and instead has filed this meritless patent in this litigation, the court should affirm. The first reason why this case is exceptional is the complete lack of pre-suit diligence. Here's a district court and this is Appendix 27, had Bayer done any due diligence, Your Honor, any, it would have learned that no witness supported Bayer's construction of the agreement and this case... Have we ever said that the lack of pre-filing investigation is solid grounds for 285? So I don't think on its own, it's certainly been a factor and even the Martek opinion and Judge Newman's opinion, the failure to understand your case before filing is, I think it's a key part of the problem. What the doctrine is designed to do is to make people think twice before filing a patent lawsuit. Here, two days after we issued a press release, they accused us of infringing seven patents on 100 claims. Two days later, there was no investigation. They didn't call their witnesses, some of whom were either current or former employees. They had no theory about why we couldn't work with the partner, Amistec, that was named in the press release. And even worse, there's an additional wrinkle here. The relevant agreement here is under UK law, under English law. And it's common ground that under English law, the facts have to be developed, have to be understood before you can read the contract. And they made no effort to explore the facts. Now, my colleague on the other side mentioned Judge Andrews, and he did deny the motion to dismiss. But let's look at exactly what he said. This is at Appendix 737. All he's saying is, if you assert a licensed offense, that's a factual defense, and you're not going to win on the motion to dismiss. And that's what the magistrate does. And he says, Appendix 18329, Andrews did not address the merits of buyer's claims. That a plaintiff survives a motion to dismiss does not necessarily mean that the plaintiff's had a culpable claim. How do you respond to Mr. Montero's point that Ms. Keating's testimony was supportive of their position? I think you read the testimony, Your Honor, but let me point you to one. Appendix 4844. The key question in this case is whether Amistec has the right to commercialize. That's common ground. That's the key question. She was asked this question three times. Here's a quote. Do you have a memory of anybody involved in the deal suggesting that Amistec wouldn't have the right to commercialize seed? So that's the key question. She was asked it three times. And you want to refer to this earlier. It's the same page. Quote, I don't have a specific memory of that specific comment. And another part of their argument now, anyway, is that buyer retained its commercial rights. But she was asked that as well. That's the same page. She was asked that question. And again, no specific memory of anyone ever discussing buyer retaining commercial rights. Now, remember, this is hundreds of millions of dollars decision. We have the head of that divestment team, Morgan, saying we had a choice. We did a study. We decided we were not going to spend the hundreds of millions of dollars to do the research and the development they were getting out. You would have thought that the associate general counsel negotiating this would remember that, as she remembers many of the details. Now, she does, in a few places, endorse the current theory that buyer is arguing. But if you look at the language, again, it's a 4845, what she is only saying is she's just reading the contract, Your Honor. She's just saying, quote, what the language says. She's not remembering. She's not a factual witness when she's giving that testimony. There was a colloquy about Lord Collins. I remember, I think it's notable, Lord Collins was not in the picture when they decided to file this lawsuit, Your Honor. He enters a picture much later, and as the district court found, and he testified live, so this is when the world of deference, when you have a district court listening to a witness and concluding as follows at appendix 26, note 10, quote, clear to this court through the cross-examination that he was unaware of the factual matrix. So Lord Collins can't help them because in the UK law, you can't construe the contract at the outset without understanding the facts. He did not know the facts. They did not give him the Keating deposition we were just talking to. He did not have the Morgan deposition that I mentioned earlier. Well, we don't know all of the interaction, of course, but we do have the opinion. And this is really, I think, what we need to decipher at what, how far do we advance the loser pays concept under the present state of the law? I think that's exactly right, Your Honor. And I understand the court's care in this context because we don't want a situation where just because you win a summary judgment motion, you then go and get fees. That's not what we're suggesting here. We're suggesting this case is exceptional for lack of the pre-suit diligence that I just talked about. And also, let's talk about the plain language reading of the contract that Judge Chen was asking about. There are simply two agreements, and when you read the two agreements together, there's only one answer. And so it's exceptional, Your Honor, because we have the lack of the pre-suit diligence. We have a plain language argument that we have not backed away from, as Judge Chen explained, a plain language argument that the district court here found contorted. And, and here's the key part, Your Honor, no witnesses that support their theory. That's another reason why this case is so unusual. No witnesses came forward to support the theory that MS Tech did not have commercialization rights. To the contrary, their witness, Morgan, says, no, we were getting out of the deal with that business. So it's exceptional because no pre-suit diligence. It's exceptional because it's premised on a theory that doesn't hold up when you actually just read the words of the two contracts. And it's exceptional because they have no witnesses to support their theory. And just to qualify that last statement, they do have Lord Collins and they do have Keating saying that they read the contracts as, as holding back commercialization rights. I understand your response, which is that's their present day reading. It has nothing to do with facts on the ground, factual matrix, and lead up to licensing agreement of some contemplation of what the contracts were trying to drive at. That's exactly right. The only little tweak I would add, Your Honor, is we do have Keating saying that she does not remember. So we have a really clear record of a contract that cannot be read of the theory of a case that they have no witnesses to support on contemporaneous time. So it's already a very narrow, narrow case, Your Honor. What about the first draft of the license agreement by Solori that the other side points to? The splitting up, the splitting up language, Your Honor. So what we were talking about there is just the contract language where we would, instead of one entity having exclusive rights to sell, there's now two entities. So it's split up in that sense. But it's not a, it's nothing more than that. I mean, it wouldn't have made sense. For the parties to decide, oh, we'll give back the commercial rights to Baird. Wasn't even asking for it. They were just dividing up instead of the one entity, two entities were sharing that right. That's all that's about. I'm not sure what to think about the E3 ownership issue. You know, while you're in litigation, you don't know which side different tribunals are going to come out. You don't want to be on the losing end of the stick in both tribunals. It's illogical to be on the, likewise, the winning side of both when you're arguing X and then you're arguing not X in two tribunals. But in order to preserve your interests, why is it so terrible to advance a position that helps you in both those tribunals, not yet knowing which way either tribunal is going to come out and then potentially stop yourself from taking the counterparty's position in the parallel proceeding? And as Your Honor states it, there'll be nothing untoward about that at all. It's not what happened here and it's not what the district court was worried about. So Your Honor, what the district court is worried about here is needless expense of patent litigation. And the E3 conduct illustrates the harm when you have parties not taking the process seriously. So yes, now in the arbitration, they quickly agree about who owns E3. But they made a big, there was a big fight about it in district court on that very topic. And that was a complete waste of the system's time. That's the part that the district court was upset about. I think, you know, there's also some sort of, you shouldn't refile on May 7th a reply brief from this court saying there are genuine disputes of material fact regarding whether E3 was made for MST or for Dow. That's Appendix 13, 9 and 5 on May 7th. And then six days later in a different hearing say MST owned E3 and Dow did not. But I'm not going to, I mean, so it's there. I don't know what to make of it. I think Your Honor has used the word factoring in. I think it factors into the overall picture. But what we have here is a totality of the circumstances inquiry from the Supreme Court. And that is part of the story of the unreasonable manner in which this case was litigated. The other piece, aside from lack of precinct diligence here, is the preliminary injunction that I think really upset the district court. She didn't use the phrase gamesmanship, but it does feel like that's what she was upset about. So March 2012 is when the complaint is filed. Almost a year later, on February 19th, they file a preliminary injunction. So why wasn't it filed when the complaint was filed, if it was so urgent? If the damage was so irreparable, why wait the year? No answer. Did something change? Nothing changed. There's just a filing to cause problems. There was no urgency around that preliminary injunction, Your Honor. Again, it's an example of stressing the system in a way that Section 285 is designed to prohibit. It's a little speculative, though, isn't it? We have, you know, there's nothing wrong with, there's nothing in the law that bars someone from filing a preliminary injunction motion in any particular time in a proceeding. No, but you don't want parties filing frivolous. That's what the district court used the word frivolous preliminary injunction motion. That's part of the unreasonable manner in which this case was litigated. Sure, if you have a preliminary injunction motion that you have a chance of winning on the merits, that you have the irreparable harm. Why was it frivolous? Because there was absolutely no irreparable harm at that moment in time? Right. There was no urgency to it. I mean, the timing of the way they filed it shows that they were just really just trying to... Because your side was still years away from actually commercializing? Exactly, Your Honor. And actually, if you look at the order that they proposed, and it's a 21-1-2-3, what they wanted the court to issue was an order destroying the very research and development that they are now saying MS Tech was allowed to let us do. So there's just a district court, and remember, we have to defer. So what we have here is a district court who's very familiar with the record, who's So with the needless litigation expense, Your Honor, that's language from our tech, Your Honor, the needless litigation expense that that buyer has inflicted on the system from the unreasonable manner in which this case has been litigated. Was it also considered frivolous because at that point, depositions of witnesses had been taken and they had explained that they didn't have a contemporaneous memory and things like that? Yes, the timing did seem to the district court to be playing games with the way depositions were coming out. It seemed like the depositions weren't going well, and so they filed a preliminary injunction. But so, yes, that's another thing that upset the district court. The economic setting is the final point that I want to get across here, that the way we have portrayed the deal, it makes a lot of sense. What happened here is buyer got out and made the decision to get out. Steinseed got in, but with limited rights because it didn't want to trigger other obligations, and MS Tech got in only for a million dollars, but now was going to have to spend tens of millions of dollars in research and development. And in fact, that's why buyer got out, but it didn't want to take the effort and the risk that MS Tech got in. And that's not me talking, that's quotes. So Appendix 4, 7, 6, 6, a lot of expense to deregulate the product. Appendix 9, 7, 6, I quote, risk to spend funds and never market anything. On the other side of the ledger, you just have what the district court called creative lawyering. Appendix 8, 9, 7, 8, there was just, quote, no record evidence of any other theory other than the one I just described. Just for my edification, what is a soybean event? We keep talking about events here all over the place. Bayer soybean events, MS soybean events. As opposed to seeds. Yeah, it's the technology that goes into the gene that allows the seed to have the characteristics that we want. So it's the technology as opposed to the actual, just the seed. It's not an actual, an event isn't the sale of anything. It's just, I'm sorry. It's a genetic modification, too, that allows the resistance. OK, thank you, Mr. Davis. Mr. Montana, you have full rebuttal, please. Thank you, Your Honor. I'd like to start just briefly with Judge Stoll's question about the preliminary injunction motion. It is false that the depositions have started. It's at footnote six of our reply brief, has all the dates. You can see them right there. I'd like to now go to where counsel. What happened to that preliminary injunction motion? It was never decided, Your Honor. Why was that? I cannot speculate, Your Honor, nor will I speculate as to why the district court felt. I mean, was it not decided because your side withdrew it? No, your note was always pending. The only hearing on it? No. Just fully briefed by both the parties? Correct. And it's not unusual, by the way, to file a preliminary injunction motion well in advance of the event that's really going to hurt you. I actually do it all the time. It's because you want to give the district court time to get whatever evidentiary hearing it needs to have. Three years? Well, you never know. I mean, I have filed preliminary injunction motions 18 months more in advance of the precipitating event because you never know how a court is going to manage the discovery necessary for a PI or the evidentiary hearing that some circuits hold is actually mandatory. So it's not that unusual. So just to be clear, your side never withdrew the preliminary injunction motion. That's correct. It just laid there. Yes. And nobody went and picked it up and touched it. Correct. And then the summary judgment motion. Your side didn't pursue it any further? Say, excuse me, Judge, we have a pending preliminary injunction motion. We're very hot under the collar. We need some resolution. Well, Dow's filing of its motion for summary judgment in the hearing thereon and three months later, a ruling against us sort of put the end to all of that. But I would like to go to the first point counsel Opposite mentioned, which is the so-called rush to filing something. The district court at A7 in note two said that it was in no way holding against Bayer that after six months of a motion to amend pending, we dropped the motion to amend and refiled a new lawsuit. Six months we had to continue to look in to all of this and hundreds and hundreds of hours billed by the Milbank firm outside counsel. It was not 48 or 72 hours. The operative complaint here was filed six months after the Dow press release, which is where I'd like to go next. And I know Judge Chen, you said it's not about Dow's conduct and it isn't, but the press release in 9941 says Dow owns Enlist. Dow cannot own Enlist if MS Tech gave it a license because MS Tech can only give licenses. Even if you buy their commercial rights theory, MS Tech can only give licenses for MS Tech events made by or for MS Tech. If Dow owns Enlist, Dow is violating our patent rights. We filed this suit. The evidence the district court relied on to decide MS Tech owned Enlist is the Rojas declaration filed by Dow in the summary judgment briefing two years later after the press release. It's an A8962 where the district court relies on the Rojas declaration. Two years go by and we find internal Dow documents that say Dow owns Enlist, A16249, and we see the press release. This is a press release from a public company. It's not true that we didn't have a basis to go forward, even putting the commercial rights completely to the side. When Dow says it owns that trait, Dow is admitting it's violating our patent rights because MS Tech cannot give it patent rights under the MS Tech agreement for a trait that Dow owns. And that was only cleared up when Dow's witness gave testimony in a declaration at summary judgment. So that entire time bears pursuing a plausible alternative theory that has nothing to do with the commercial rights issue, that is that this is not made by or for MS Tech by Dow's own admission. We lose and then we take that into the arbitration. And I think the way you described it, Judge Chen, is absolutely correct. What were we supposed to do? Lay on our sword, die on our sword both times on utterly irreconcilable factual theories? And yes, there's a lot of money at issue here, but that really confuses the issue. Stein only paid $5.6 million for this. If Dow had been our counterparty, if BASF had been our counterparty, they would have paid a lot more, which is exactly why. However, you look at the language, Bayer did retain a right to be a part of the conversation. Witnesses did support Bayer, Margaret Keating did. And the last point I'll make is David Morgan testified repeatedly that Bayer viewed MS Tech and Stein as the same thing over and over again. The district court even observed it at A17 note 17. A4488 is an example of Morgan testifying this way. Margaret Keating did, too. Everybody looked at the Stein Group the same way, which is why everybody at Bayer agreed the Stein Group could commercialize. That's got nothing to do with whether the Stein Group could sublicense. And yes, there's no evidence that anyone from Bayer recalled Stein Group not having the right to sublicense. But there's absolutely no evidence that anyone even talked about the Stein Group sublicensing, none at all. The agreements speak for themselves. There was a ban on sublicensing. Thank you. Thank you. Thank you both. The case is taken under submission.